**Opinion issued January 17, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-00072-CV

———————————

**BILL JOHNSON AND MELANIE JOHNSON, Appellants**

**V.**

**BP PRODUCTS NORTH AMERICA, INC., Appellee**

---

**On Appeal from the 10th District Court**
**Galveston County, Texas**
**Trial Court Case 08-CV-0188**

---

## MEMORANDUM OPINION

Appellants, Bill Johnson and Melanie Johnson, challenge the trial court's rendition of summary judgment in favor of appellee, BP Products North America, Inc. ("BP"), in their suit against BP for negligence. In four issues, the Johnsons contend that the trial court erred in granting BP summary judgment.

We affirm.

## Background

In their original petition, the Johnsons alleged that Bill, who was an employee of Starcon International, Inc. ("Starcon"), an independent contractor, sustained heat-related injuries while working at a BP refinery in Texas City when BP failed to protect Bill from heat illness. Specifically, the Johnsons alleged that BP violated its own Health, Safety & Environment ("HSE") policies and procedures by "not postponing the work for a cooler time of the day," "not having the proper [safety] equipment," and not training its supervisors to recognize heat illness. The Johnsons complained that, on the day of his injuries, Bill had notified BP supervisor Bill Cooksley that he "did not feel well," Cooksley "failed to recognize the signs and symptoms" of "heat exhaustion," Cooksley failed to summon emergency assistance, and Bill subsequently suffered from a "heat stroke" that was followed by a "stroke." The Johnsons sought damages for, among other things, pain, mental anguish, medical expenses, and lost earnings.[1]

In its answer, BP generally denied the Johnsons' allegations. BP then moved for summary judgment, contending that the summary-judgment evidence established that Cooksley did not supervise or direct Bill; Bill was a Starcon

---

[1] The Johnsons also sued Cooksley individually. The trial court granted summary judgment in favor of Cooksley, and the Johnsons do not challenge that judgment in this appeal. BP represents that the Johnsons' claims against Cooksley were severed.

2

employee who reported to Carl Beach, an employee of another independent contractor, "Fluor"; Bill did not approach Cooksley about needing to "cool down"; and Cooksley did not communicate with emergency medical personnel about Bill's medical condition. BP asserted that the heat-related working conditions at its facility were "open and obvious" and it was Bill's employer, Starcon, which owed him a duty to "monitor" for heat exhaustion and warn of heat-related working conditions. BP also contended that no evidence supported the Johnsons' negligence claim on the elements of duty, breach, or proximate cause.

In their response to BP's motion, the Johnsons asserted that the summary-judgment evidence established that BP did not "exercise" any of its heat-related policies, Cooksley and Beach "failed to enforce BP's heat preventative policies," Cooksley and BP "failed to recognize [Bill's] symptoms of heat illness," BP had the "right of supervisory control as to heat prevention," BP retained "a contractual right of control" and "exercised actual control" over the manner in which Bill performed his work, BP "failed to abide by [its] safety and health rules," BP "retained the right to control heat illness and heat stress prevention," Cooksley and BP "would have been aware" of the BP heat-related policies that "were not being enforced," BP "failed to ensure that proper heat protection policies were used," and BP "failed to ensure that cooling equipment was present."

3

In its reply to the Johnsons' response, BP argued that because the Johnsons did not present any evidence that it contractually retained the right to control the means, methods, or details of Bill's work, the only duty it owed Bill in regard to its safety regulations was to not "unreasonably increase the probability and severity of injury." BP asserted that the "fact that BP implemented policies to prevent heat illness and the fact that [] Cooksley was one of several people who might have communicated these policies to Starcon" employees did not demonstrate that BP controlled the operative details of Bill's work.

The trial court, without specifying the basis for its ruling, granted BP's summary-judgment motion.

## Standard of Review

To prevail on a summary-judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and there is no genuine issue of material fact. TEX. R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). When a defendant moves for summary judgment, it must either (1) disprove at least one essential element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of its affirmative defense, thereby defeating the plaintiff's cause of action. *Cathey*, 900 S.W.2d at 341. When deciding whether there is a disputed, material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true. *Nixon v.*

4

*Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985). Every reasonable inference must be indulged in favor of the non-movant and any doubts must be resolved in his favor. *Id.* at 549.

To prevail on a no-evidence summary-judgment motion, a movant must allege that there is no evidence of an essential element of the adverse party's cause of action or affirmative defense. TEX. R. CIV. P. 166a(i); *Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004). We review a no-evidence summary judgment under the same legal-sufficiency standard used to review a directed verdict. *Gen. Mills Rests., Inc. v. Tex. Wings, Inc.*, 12 S.W.3d 827, 832–33 (Tex. App.—Dallas 2000, no pet.). Although the non-movant is not required to marshal his proof, he must present evidence that raises a genuine issue of material fact on each of the challenged elements. TEX. R. CIV. P. 166a(i); *see Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). A no-evidence summary-judgment motion may not be granted if the non-movant brings forth more than a scintilla of evidence to raise a genuine issue of material fact on the challenged elements. *See Ridgway*, 135 S.W.3d at 600. More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). When reviewing a no-evidence summary-judgment motion, we assume that all evidence favorable to the non-

movant is true and indulge every reasonable inference and resolve all doubts in favor of the nonmovant. *Spradlin v. State*, 100 S.W.3d 372, 377 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

## Duty

In their four issues, the Johnsons argue that the trial court erred in granting summary judgment in favor of BP because fact issues exist as to whether BP's negligence proximately caused Bill's injuries, they presented more than a scintilla of evidence that BP retained contractual control and exercised actual control over Bill's work, and they presented more than a scintilla of evidence on each element of their negligence claim.[2]

There are two types of premises defects for which an independent contractor's employee may seek to hold a premises owner or general contractor liable. *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex. 1997). The first category includes those defects that exist on a premises when a business invitee enters for business purposes or are created through some means unrelated to the activity of the injured employee or his employer. *Id.*; *Shell Chem. Co. v. Lamb*, 493 S.W.2d 742, 746 (Tex. 1973). When dangerous conditions do not arise

---

[2] The Johnsons present four separate issues, but, within each issue, they include arguments concerning the issue of the duty owed by BP to Bill. Because we resolve this case on the issue of duty, we do not directly address the parties' dispute over whether the Johnsons presented any evidence that the heat-related working conditions caused Bill to sustain personal injuries.

through the independent contractor's work activity, the owner or general contractor has a duty to inspect the premises and warn about the dangerous conditions of which the owner or general contractor knows or should know. *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 215 (Tex. 2008); *Olivo*, 952 S.W.2d at 527. An independent contractor is "under no duty to inspect the premises for concealed dangers" because independent contractors may "anticipate" that the owner or general contractor "will discharge [its] duty to inspect the premises and warn of any dangerous condition which is not open and obvious." *Lamb*, 493 S.W.2d at 746; *see also Moritz,* 257 S.W.3d at 215 (stating that "[g]enerally, a landowner is liable to employees of an independent contractor only for claims arising from a pre-existing defect rather than from the contractor's work, and then only if the pre-existing defect was concealed").

The second category of premises defects includes those defects that an independent contractor, or its injured employee, creates by its work activity. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002); *Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 225 (Tex.1999); *Olivo*, 952 S.W.2d at 527. When the independent contractor creates a dangerous condition, the owner or general contractor ordinarily has no duty to warn the independent contractor's employees of the premises defect. *Olivo*, 952 S.W.2d at 527; *see also Moritz,* 257 S.W.3d at 215–16 (stating that rationale for rule that owner or general contractor

7

normally has no duty to ensure that independent contractor performs work in safe manner is because independent contractor "owes its own employees a nondelegable duty to provide them a safe place to work, safe equipment to work with, and warn them of potential hazards" and a premises owner that "hires an independent contractor generally expects the contractor to take into account any open and obvious premises defects in deciding how the work should be done, what equipment to use in doing it, and whether its workers need any warnings"). The Texas Supreme Court has explained that a duty is ordinarily not imposed on a premises owner or general contractor in this circumstance because "independent contractors are hired for special projects that often entail special expertise, and can be expected to use whatever equipment or precautions are necessary so long as a hazard is not concealed." *Moritz*, 257 S.W.3d at 217.

However, in regard to this second category of premises-defect claims, when a premises owner or general contractor exercises some control over an independent contractor's work, it may be liable unless it exercises reasonable care in supervising the subcontractor's activity. *Dow Chem. Co.*, 89 S.W.3d at 606 (citing *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985)). For a duty to attach, the owner's or employer's role "must be more than a general right to order the work to start or stop, to inspect progress or receive reports." *Redinger*, 689 S.W.2d at 418 (citing RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965)).

8

An independent contractor may prove a right to control in two ways: "first, by evidence of a contractual agreement that explicitly assigns the premises owner a right to control; and second, in the absence of a contractual agreement, by evidence that the premises owner actually exercised control over the manner in which the independent contractor's work was performed." *Dow Chem. Co.*, 89 S.W.3d at 606. A contractual right of control over the means, methods, or details of the independent contractor's work gives rise to a duty to see that an independent contractor performs work in a safe manner, and the circumstance that no actual control was exercised does not absolve the owner or general contractor of liability. *Id.* (citing *Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 804 (Tex. 1999)). "Further, the control must relate to the injury the negligence causes, and the contract must grant the contractor at least the power to direct the order in which work is to be done." *Id.* (citations omitted). The right to control "must be more than a general right to order the work to start or stop, to inspect progress or receive reports." *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965)). Whether a contract gives a right of control is generally a question of law for the court. *Id.* (citing *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001)).

In addition to contractual control, a premises owner who exercises actual control over the contractor's work may also be subject to direct liability for negligence. *Id.* at 607. However, "merely exercising or retaining a general right to

9

recommend a safe manner for the independent contractor's employees to perform their work is not enough to subject a premises owner to liability." *Id*. (citing RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965)). The control exercised by the owner "must relate to the injury the negligence causes." *Id*. And, if a premises owner exercises control by requiring a subcontractor to comply with its safety regulations, the premises owner owes the subcontractor's employees a narrow duty of care that its safety requirements and procedures do not unreasonably increase the probability and severity of injury. *Id*.

***Contractual Control***

The Johnsons' first argue that BP owed Bill a duty because it retained contractual control over the methods, means, and details of his work in such a way so as to impose liability upon BP for his heat-related illness and subsequent personal injuries.

BP and Starcon, Bill's independent-contractor employer, entered into a "Mechanical & Piping Turnaround Services Contract" ("the Contract"), which provided, in pertinent part,

> 4.01 In addition to the safety and health provisions contained in Exhibit C, attached hereto and incorporated by reference, Contractor shall abide by any and all of Company's, as well as OSHA's, safety and health rules . . . Any equipment provided by Company to Contractor for the benefit of Contractor's employees or those of its subcontractors shall be provided on an "as is" basis with no warranty of performance and at the sole risk and liability of Contractor to ensure that such equipment is

10

fit for the use intended and in proper working order. Contractor has a duty to inspect the equipment prior to use, and agrees to defend, indemnify, and save harmless Company from any and all claims of Contractor, subcontractors, and their employees arising out of the use of any equipment furnished by Company or advice given by Company relating to such equipment to the fullest extent allowed by law. . . .

Exhibit C, entitled "Health, Safety, and Environmental Minimal Requirements,"

which was attached to the Contract, provided, in pertinent part,

The following minimum Health, Safety, and Environmental ("HSE") requirements shall apply with respect to work performed by Contractor under this Contract. Contractor shall take any additional precautions necessary to prevent injury or death to persons or damage to property and/or the environment.

1. Contractor shall comply with applicable health, safety, and environmental regulations of agencies having jurisdiction at locations where work is performed for Company. Contractor shall ensure that its subcontractors comply with said regulations.

2. Unless prior express contractual arrangements are made with Company, Contractor shall provide all personnel furnished by or on behalf of Contractor ("Contractor's Personnel") with appropriate functional safety equipment and ensure that such equipment is used.

3. Unless prior express contractual arrangements are made with Company or statutory requirements dictate otherwise, Contractor's Personnel shall be trained in the appropriate health, safety, and environmental codes and regulations as required by all governmental or regulatory agencies having jurisdiction at the work site.

. . . .

6. Contractor will be evaluated on its health, safety, and environmental performance. The assessment of a contractor's performance may include evaluation of its health, safety, and

11

environmental record-keeping and, if applicable, prior work experience with Company. This evaluation will be used as criteria in the selection of contractors for future Company projects.

 7. As directed by Company representative, Contractor shall hold regular safety meetings with its staff regarding Company's minimum HSE requirements. After each meeting, Contractor shall document the subject of the meeting including a list of attendees and forward this information to Company representative.

 . . . .

 Contractor shall reference the BP Texas City Site HSE Rules on the Texas City Safety Council web site for all specific requirements . . . .

Additionally, HSE Policy PR-13, entitled "Procedure: Prevention of Heat Illness," which applied to "all employees involved in work activities that create the potential for the development of heat illnesses" and was designed to "minimize the potential for heat illness among site personnel," provided,

 A. It is the responsibility of each employee and their supervisor to determine appropriate work/rest schedule for working in hot temperatures. Refer to Attachment 1 for heat exposure guidelines and the WGBT Data on the HSE web. . . . . The employee and their supervisor will consider the following factors making this determination:

  1. Level of activity required by the job.

  2. Protective clothing requirements.

  3. Weather and/or equipment temperature conditions.

  4. Personal factors (i.e. medical conditions and fatigue).

12

B.  Equipment that is used to reduce the potential for heat stress will be made available to employees. The following equipment will be available for routine or short duration jobs:

    1.  Cooling vests/phase change vests.

    2.  Portable fans/blowers/air conditioning units (with or without water mist).

    3.  Portable shades.

C.  Temporary cool down areas will be constructed for turnarounds and multiple shift projects during periods of hot weather. The cool down areas will be constructed to provide shade and will be equipped with benches, water coolers, and fans.

D.  It will be the responsibility of supervision to plan and schedule jobs in such a way as to reduce potential heat stress. The following will be considered during job planning and scheduling:

    1.  Schedule strenuous jobs for cooler parts of the day (or at night).

    2.  Ensure adequate manpower levels for the work to be planned.

    3.  Maintain communication between operations and maintenance to ensure personnel are not waiting in the heat or rushing to get equipment ready.

Relying primarily upon this policy, the Johnsons assert that BP was "aware of the extreme heat conditions" at the refinery, "negligently failed to implement" its own policies, and "failed to supply the minimum equipment and protection required by BP's rules."

13

The Johnsons also assert that BP retained contractual control based upon other provisions in the Contract that granted BP the right to control work scheduling, conduct or call for meetings with independent contractors, and fire contractor employees. For example, the Johnsons cite, among other contractual provisions, the following:

> 7.03 Any employee of Contractor deemed by Company, in their sole judgment, to be objectionable shall be removed from the Work site immediately upon Company request and shall be promptly replaced by Contractor at no extra expense to Company. Contractor shall nevertheless retain all authority and control over its employees, . . . .

> 11.01 Daily, monthly and/or quarterly performance review meeting will be held, at Company's discretion, to review the work performed under this contract. Contract performance, key result, . . . safety, action items and similar information will be reviewed at the meetings with Company. . . .

> 12.01 The Scope of Work shall be subject to change by additions, deletions or revisions thereto by Company. Contractor will be notified of such changes by receipt of additional and/or revised drawings, specifications, exhibits or other written notification.

> 39.03 Contractor recognizes that Company and other contractors and subcontractors may be working concurrently at tile Work site. Contractor agrees to cooperate with company and other contractors so that the project as a whole will progress with a minimum of delays. Company reserves the right to direct Contractor to schedule the order of performance of its Work in such manner as not to interfere with the performance of others.

> 49.01 Contractor shall comply strictly with Company's rules governing the conduct of Contractor and Contractor's employees, agents and subcontractors at and about the Work site. Contractor agrees that it shall ensure that its supervisory

14

personnel, employees, agents and subcontractors at the Work site comply strictly with such rules. Company reserves the right to, from time to time, revise any such rules, and Contractor shall comply fully with such rules as revised in accordance with the foregoing provisions.

In regard to BP's safety policies, the plain language of article 4.01 of the Contract and the attached Exhibit C imposed contractual responsibility upon Starcon for the workplace safety issues implicated in this case. Although BP published a specific heat-related policy, the Contract expressly required Starcon to "abide by any and all of" BP's "safety and health rules." Exhibit C, which was attached and incorporated into the Contract, stated that, absent other "prior express contractual arrangements" between the parties, Starcon was responsible for providing all of its personnel "with appropriate functional safety equipment and ensur[ing] that such equipment is used." And, other provisions in the Contract also expressly required Starcon to "comply strictly with Company's rules governing the conduct of Contractor and Contractor's employees."

An agreement between a premises owner and an independent contractor that requires the contractor to comply with the safety rules and regulations promulgated by the premises owner does not create a contractual right of control over the "means, methods, or details" of the contractor's work sufficient to impose a duty upon the premises owner. *Dow Chem. Co.*, 89 S.W.3d at 607. Rather, the imposition of such safety requirements by a premises owner "give[s] rise to a

15

narrow duty of care" that its safety requirements and procedures do not "unreasonably increase . . . the probability and severity of injury." *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 358 (Tex. 1998). Here, there is no evidence that BP's policies, including its heat-related policy, which its independent contractors (including Starcon) were contractually obligated to follow, were "generally dangerous or unreasonable." *See id.*

Additionally, the contractual provisions cited by the Johnsons concerning BP's ability to fire Starcon employees, conduct meetings, and schedule work did not give rise to a contractual right of control over the means, methods, and details of Bill's work. *See Dow Chem. Co.*, 89 S.W.3d at 608–09 (holding that premises owner's "safe work permit system" that was intended to create "a safer construction site" did not "unreasonably increase the probability and severity of [the contractor's] injury"); *Koch Refining Co. v. Chapa*, 11 S.W.3d 153, 156 (Tex. 1999) (holding that presence of premises owner's safety representative and possibility that safety employee might have intervened to stop dangerous work not sufficient to create duty); *Victoria Elec. Co-op., Inc v. Williams*, 100 S.W.3d 323, 330 (Tex. App.—San Antonio 2002, pet. denied) (holding that contract allowing utility to "inspect, test, and approve" independent contractor's work to ensure compliance with contract specifications and safety requirements did "not implicate a right to control the details of the independent contractor's work").

16

Accordingly, we conclude that the Johnsons presented no evidence that BP retained a contractual right of control over the means, methods, or details of Bill's work such that liability may be imposed upon BP for Bill's heat-related illness and subsequent personal injuries.

*Actual Control*

The Johnsons next argue that BP owed Bill a duty because it "exercised a degree of control" over Bill's work that included actual control over heat-related illness prevention at the refinery.

Actual control is not established by evidence showing that a property owner maintained general "control of the facilities." *Vanderbeek v. San Jacinto Methodist Hosp.*, 246 S.W.3d 346, 352 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Moreover, "merely exercising or retaining a general right to recommend a safe manner for the independent contractor's employees to perform their work is not enough to subject a premises owner to liability." *Dow Chem. Co.*, 89 S.W.3d at 607 (citing RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965)). Finally, actual control that is sufficient to trigger liability "must relate to the injury the negligence causes." *Dow Chem. Co.*, 89 S.W.3d at 607.

As they did in their contractual-control argument, the Johnsons base their actual-control argument upon BP's heat-illness policy. The Johnsons assert that BP had "the right to control heat illness and heat stress prevention," Cooksley "was

present at most times during the turnaround" and obtained status reports of the workers' progress, Cooksley "would have received a status from [Bill]," Cooksley was "aware of BP policies related to heat illness and heat stress prevention that were not being enforced," and BP "was aware and did not object to the work being performed without cooling equipment."

The Texas Supreme Court has rejected similar arguments on two occasions. *See id*. at 608–09; *Koch*, 11 S.W.3d at 156. In *Dow Chem. Co.*, the court held that a premises owner's work permitting system and the presence of a premises owner's safety representative did not "unreasonably increase the probability and severity of [the independent contractor's] injury." 89 S.W.3d at 607–09. The court concluded that there was no evidence that the independent contractor employees "were not free to do the work in their own way" or the premises owner "controlled the method of work or its operative details." *Id*. The court further concluded that the premises owner's "general right under the safe work permit system to preclude work from beginning in the first instance [was] insufficient to establish actual control." *Id*. at 609.

Similarly, in *Koch*, an injured employee argued that a premises owner owed a duty based on the presence of a safety representative and the possibility that the representative could intervene to stop dangerous workplace conduct. 11 S.W.3d at 156. The employee also argued that the premises owner owed a duty because the

premises owner's safety representatives had allegedly instructed the independent contractor's employees in the past to perform their work in a safer manner. *Id.* The court concluded that the employee presented no evidence that the premises owner exercised the degree of control necessary to create a duty. *Id.* Instead, the court held that the premises owner owed the independent contractor's employees only "a duty that any safety requirements and procedures it promulgated did not unreasonably increase, rather than decrease, the probability and severity of injury." *Id.* (quoting *Hoechst-Celanese Corp.*, 967 S.W.3d at 358).

The Johnsons argue that because the facts in the instant case are substantially distinguishable from those presented in *Dow Chem. Co.* and *Koch*, we should be guided by the Texas Supreme Court's opinion in *Lee Lewis Construction, Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001). In *Harrison*, the survivors of an independent contractor who fell to his death while installing windows sued both the general contractor and a subcontractor for negligence. *Id.* at 782. The plaintiffs alleged that the general contractor "exercised actual control over safety, in particular, the fall-protection systems" used by the independent contractor's employees. *Id.* at 783. In support of their allegation, the plaintiffs presented testimony that the general contractor personally witnessed and "approved" of the specific fall-protections systems that had been used by the independent contractor. *Id* at 784. They also presented testimony that the general

contractor "knew" of and did not object to the independent contractor's use of a "bosun's chair without an independent lifeline." *Id* at 783–84. The court concluded that this evidence demonstrated that the general contractor "retained the right to control fall-protection systems on the jobsite" and, therefore, it owed a duty of care to the independent contractor's employees "commensurate with that right." *Id* at 784.

Here, in contrast, although there is evidence that BP maintained heat-related policies and BP personnel communicated those policies to independent contractors, there is no evidence that, by doing so, BP controlled the operative details of Bill's work. *See Good v. Dow Chem. Co.*, 945 S.W.2d 877, 882 (Tex. App.—Houston [1st Dist.] 1997, no writ) (holding that "while Dow personnel may have been on site to observe compliance with safety procedures, Dow's retention of control did not rise to the level of control" sufficient to create a duty). There is also no evidence that BP was aware that Starcon "routinely ignore[d]" safety polices. *See Hoechst-Celanese*, 967 S.W.2d at 357 ("[A]n employer who is aware that its contractor routinely ignores applicable federal guidelines and standard company policies related to safety may owe a duty to require corrective measures to be taken or to cancel the contract."). Instead, similar to the facts in *Dow Chem. Co*. and *Koch*, here, there is evidence that BP only required its independent contractors to abide by its safety policies, including its policy related to the prevention of heat-

20

related illness.  There is evidence that BP personnel were on site and, pursuant to the Contract, would have participated in meetings at which safety issues were reviewed.  However, the contractors were contractually required to follow applicable safety rules and were responsible for furnishing their personnel "with appropriate functional safety equipment" and to "ensure that such equipment is used."  There is no evidence that, despite this contractual delegation of responsibilities, BP retained actual control over the operative details of Bill's work, the heat-related working conditions, and the associated equipment that was furnished or should have been furnished to Bill to account for these working conditions.

Accordingly, we conclude that the Johnsons presented no evidence that BP retained actual control over Bill's work in a manner for which BP can be held liable for Bill's heat-related illness and subsequent injuries.

## Conclusion

We hold that the trial court did not err in granting BP summary judgment and we overrule the Johnsons' four issues.

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Sharp.

21